IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

Marsha Heath, et al.,

Plaintiffs,

versus 3:18 CV 720

Trans Union, LLC,

Defendant

Before: HONORABLE JOHN A. GIBNEY, JR.
United's States District Judge

Motion to dismiss

March 15, 2017

Richmond, Virginia

GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

APPEARANCES

Kristi Kelly, Esq.
For the plaintiffs

Michael O'Neill, Esq.
Travis Sabalewski Esq.
for the defendant

THE CLERK: Case number 3:18 CV 720.

Marsha Heath and others versus Trans Union LLC.

Ms Kristi Kelly represents the plaintiffs.

Mr. Michael O'Neill and Mr. Travis Sabalewski represent the defendant.

Are counsel ready to proceed?

MS KELLY: Plaintiffs are.

MR. O'NEILL: Yes, Your Honor.

THE COURT: All right.

Ready to roll on the motion to dismiss?

MR. O'NEILL: Yes, Your Honor.

THE COURT: All right.

MR. O'NEILL: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. O'NEILL: Michael O'Neil on behalf of Trans Union. Thank you very much for allowing us the opportunity to address any questions The Court has on the motion to dismiss that was filed.

There has been a fair amount of briefing and fair number of legal doctrines that have been discussed in the briefing. But, Your Honor, the motion to dismiss is premised upon one simple contention, which is, that the claim under section 1681 e(b) of the Fair Credit Reporting Act, that claim that a consumer reporting agency has reported inaccurate information cannot be used as a

collateral attack on the legal validity of the debt.

The Fourth Circuit in a 2008 opinion, Saunders versus Branch Banking and Trust expressed the concern, one of the earliest courts, appellate courts to express a concern that claims, accuracy claims, against credit bureaus and other consumer reporting agencies can be used to collaterally attack the legal validity of a debt.

Now that was dicta, Your Honor. But since then every appellate court that has looked at the issue, and numerous district courts have looked at the issue, have agreed that it is inappropriate for a consumer to factually concede the debt but assert a legal defense to a debt that has not yet been adjudicated, and demand that the consumer reporting agency adjudicate it.

THE COURT: I think what they are saying in this case, though, is a little different than that. They are saying that all of these Western Sky and Cash Call cases, these are the things that involve those alleged native American tribes, right?

MR. O'NEILL: Yes, Your Honor.

THE COURT: They are saying those things have been adjudged uninforceable again and again and again, especially in Virginia. So they are saying, don't you have some obligation to not list those as debts given that the courts have declared again and again and again that

they are invalid? That is what they are saying.

MR. O'NEILL: Your Honor, that was plaintiffs' original claim. They focus on the Hayes settlement that was entered by this court, and they said -- their initial claim was that the Hayes settlement extinguished their debts, and that therefore we should have known that and therefore it was inaccurate.

THE COURT: Yes.

MR. O'NEILL: Then they recognize that those allegations were inconsistent with the allegations they had against Diaz and Associates. And we talked to them about it, and the plaintiffs correctly amended their complaint to come up with a new theory to say, well, even if the Hayes settlement didn't forgive those loans, because they didn't, but we should have been put on notice of all these other settlements.

And interestingly, Your Honor, the notice allegations are made on information and belief. And they are not made with respect to the Hayes settlement, which is the only one that is relevant to the four plaintiffs because they are all Virginia residents. So, in fact, we have never reported these debts from Western Sky or Cash Call. Never did. That is why we never got any notice of the settlement, because they didn't apply to us.

So, that was the claim early on. Now it seems to me

the claim --

THE COURT: Well, but, these people have Western Sky loans, don't they?

MR. O'NEILL: Yes. But they were not reported by Western Sky. They were reported by a third party debt purchaser, Diaz and Associates. And that is important, Your Honor, because only Western Sky and Cash Call were obligated to tell the credit bureaus the accounts we reported to you, stop reporting them. They never reported them to us, and we never reported them as well.

THE COURT: It seems to me like your defense is, we are allowed to stick our head in a hole in the ground and not pay attention to what is going in the world.

MR. O'NEILL: It is important to note all this goes to whether or not we should have had procedures in place to learn of these settlements and to do something about them.

THE COURT: Don't tell me you didn't know. I simply don't believe that.

MR. O'NEILL: Your Honor, I can tell you the investigation we have done to date, we did not know about it.

THE COURT: Trans Union, the multi billion dollar company that deals with these things, doesn't know anything about the invalidity of these quasi Indian loans?

MR. O'NEILL: Well first, Your Honor, I don't think any of the settlement agreements that the plaintiffs --

THE COURT: Is that a yes or no?

MR. O'NEILL: No.

THE COURT: Okay. Well.

MR. O'NEILL: First, Your Honor --

THE COURT: Trans Union then does stick its head in the ground.

MR. O'NEILL: There have been no adjudications. I am not aware of any single court adjudicating these debts as being invalid. Instead Western Sky and Cash Call agreed with certain states to forgive the loans. But, again, Your Honor, we were not reporting those loans from Cash Call and Western Sky. That is why we didn't get any notice. We were reporting them from Diaz.

But, that all goes to an element of the claim, which is not at issue in the motion to dismiss. Because they made lots of arguments for why we should have known, and we should have somehow investigated this even without a dispute by the plaintiffs. But the question is whether or not this is -- because, keep in mind, Your Honor, they are not claiming we failed to investigate, not claiming they came to us and we said, no. What they are claiming is that even before the four plaintiffs came to us that we should have sua sponte said, wait a minute, these loans

seem to usurious under Virginia law, we don't think the tribal sovereign immunity applies, and that we should have done that analysis before we even reported the loan.

THE COURT: Well, I'm not sure how much analysis is required given what has happened with these loans. But, you know, maybe Trans Union just -- maybe that's the way they do business. Maybe that is not the way they ought to do business.

MR. O'NEILL: Your Honor, I can assure you that whenever we get notice, and there have been instances where we have gotten notices from state regulators, that they have decided that loans shouldn't be reported, and, of course, we don't report them. There is no advantage to reporting loans we should have been reporting, but in the ordinary course, we get loans we have no reason to believe from the furnisher or from the consumers that there is some potential legal defense to the loans. That is what we are talking about, Your Honor. We are not talking about them ever saying we never took out the loans. They are saying that I talked to a lawyer, and the lawyer thinks I can get out of this loan.

THE COURT: Well, that is not exactly what they are saying. What they are saying is lawyers and judges all around the country have indicated that these loans are invalid, and you ought to know it.

MR. O'NEILL: I think the complexity of that issue is demonstrated by the efforts the plaintiffs' counsel has made, first in the Hayes settlement to get these loans extinguished, and the later in the Diaz and Associates case before this court.

Great efforts on their part, Your Honor, but in neither of those cases did the plaintiffs or counsel get a rolling, or even an agreement, that these loans are void admonitio. I think that demonstrates that is not a simple problem.

THE COURT: Anything else?

MR. O'NEILL: If you don't have any other questions, no.

THE COURT: I don't have any other questions.

Ms Kelly?

MR. O'NEILL: Thank you, Your Honor. Thank you, Judge.

Just briefly to address a couple things that Your Honor mentioned. You know, the question is that Trans Union is trying to get The Court to, for the position that Trans Union is trying to get The Court to take, is that there is a distinction between factual and legal accuracy in that theory, and there is not. Regardless, the Cash Call situation is unique. Nobody thinks that these loans are legal and should be reported on credit reports.

THE COURT: Well, he does. He thinks they are.

MR. O'NEILL: Except for Trans Union.

THE COURT: Okay. By them.

MS KELLY: The Fourth Circuit in 2016 called these loans dubious, a farce. So no one actually believed that --

THE COURT: Is that the case where I was reversed?

MS KELLY: It was, Your Honor.

And no one actually believed that these loans could comply with state or federal law.

In February of 2016 that is what the Fourth Circuit said.

There was a class action settlement in this court. There were numerous Attorney General actions. There is a CFP judgment in the Northern District Of California against this enterprise. And the creditor, Mr. Diaz, the debt collector, called me and immediately once he saw the law suit and said, this is a mistake. I should have never been reporting these. So even Mr. Diaz, the debt collector, doesn't think that they should have been on credit reports.

THE COURT: Well, did Mr. Diaz tell Trans Union it was a mistake?

MS KELLY: When my client disputed to Trans Union, he removed it. He had moved to delete this because it should

not be on a credit report. So there is nobody that thinks these debts are valid except for Trans Union.

They are actually doing the opposite. They are going out of their way to say that these debts are legal and this is a collateral attack. But, everyone, the creditor, Western Sky stopped doing business in 2013. They didn't issue another loan, because they realized that this was not an appropriate business model.

There are numerous judgments and opinions. And what Trans Union is saying, just because I did not go to trial against Diaz and Associates, and he called me said, this is a mistake, I am so sorry, there is some e-mails here, I am going to sign a consent decree to correct this. They are saying because I didn't waste The Court's resources, go to trial and have you decide that they are void, that they can keep reporting these loans on consumer's credit reports. That is not what the statute provides for.

This is not a collateral attack issue. This is a unique situation where Cash Call went into a dubious business model and prayed on vulnerable consumers. Courts around the country have held these loans are improper. And settlements were entered into to give consumers payment for you usurious interests that they paid.

The debts that might, the named plaintiff had, were sold before the settlements were entered into. So they

could not be forgiven by a party that wasn't party to a case.

But there is still no basis for Trans Union to argue that this is a collateral attack, because it is both factually and legally inaccurate.

THE COURT: Okay.

MS KELLY: The statute is really clear, Judge. There is no distinction between factual and legal accuracy anywhere in the statute. And Trans Union is asking The Court to make the statute more confusing than it actually is. All we need to show is that the reporting of these accounts was inaccurate and Trans Union failed to maintain reasonable procedures to assure maximum possible accuracy.

When some of the plaintiffs first disputed in 2017, he included a copy of the consent decree, the final order in the Hayes case. Yet Trans Union kept reporting the information a year later when our last plaintiff disputed. So Trans Union knew about the settlement and knew about the decisions and prior court rulings and continued to report the information.

There is just no basis for them to argue that it is a legal inaccuracy versus a factual inaccuracy.

So we ask Your Honor to deny the motion.

THE COURT: All right. Thank you, ma'am.

MR. O'NEILL: May I respond? Thank you.

THE COURT: Sure.

MR. O'NEILL: The purported invalidity of these debts is not nearly as universal as Ms Kelly would suggest. First off, only about 17 or 18 states in this country which have the type of usury laws that might make these loans invalid. The complaint only cites I think 12 or maybe 13 settlements. This is not something across the board that is so objection.

THE COURT: Mere 12 or 13.

MR. O'NEILL: Your Honor, it is also, you have to understand what Trans Union would have to do. First you have to understand what was the state of residence of each consumer at the time the loan was entered into. Then you need to look at the usury laws of that state. Then Trans Union needs to figure out the interest rates, which it never gets. So they have to figure out the interest rates. And then here is the really tricky part we haven't gone into. Because the complaint didn't mention that these lenders were tribal lenders, but the briefing does. That adds a whole another layer of complexity of the application of tribal sovereign immunity. Because that is the business model. That we are not subject to the laws of Virginia because we are licensed as a tribal lender. Judge Payne down the hallway, Your Honor, spent 78 pages trying to wade through the tribal sovereign immunity

issue.

THE COURT: He is a lot more thorough than most people. And he is also upstairs. And don't ever tell him he is on the same floor as me.

MR. O'NEILL: I apologize, Your Honor. I apologize to him next time I see him.

But the point is, it is not as simple as it may appear. And there have been plenty of courts addressed with identical situations, the Dealing court and the Padget court. Identical issues where tribal lenders were allegedly engaging in usurious loans. And there was, there there was adjudication. Unlike here. There there really was adjudication that the loans were invalid. But even there both courts recognized that it is just not possible to impose on credit bureaus the burden -- before they even report it for the very first time -- to do this legal analysis, which is very difficult.

The consumers have lots of other remedies that they could pursue, as they tried to do against Diaz and Associates. You know, they can go after them. Its funny that Ms Kelly says even Mr. Diaz was reporting them. He apparently thought it was fine to report them until he got the complaint filed by Ms Kelly.

So, again, all the evidence shows that this is not as simple as is suggested.

THE COURT: Okay. All right. Thank you very much.

MR. O'NEILL: Thank you, Your Honor.

THE COURT: All right.

To state a claim under this particular section of the statute plaintiff has to allege facts showing that the consumer report contains inaccurate information and the reporting agency did not follow reasonable procedures to assure maximum accuracy.

The plaintiff has pleaded facts showing that Trans Union responded to a request to remove Cash Call debts from consumer reports following individual requests without disputing the removal. This gives rise to a plausible claim that Trans Union reported inaccurate information on the credit report. Because I have to accept as true the factual allegations in the complaint and draw all reasonable inferences I conclude that the plaintiffs have adequately stated a claim under the statute.

So I deny your motion to dismiss.

All right.

Let's set this case for trial.

I stayed discovery until this motion was decided so that we could make sure that you didn't have to do it unnecessarily.

So I don't exactly know what kind of volume of

discovery there is pending out there. Have you filed discovery, Ms Kelly?

MS KELLY: Yes, judge. We have done discovery. We don't think, I mean we have only a few depositions, but not a lot. We are prepared to move forward quickly. Personally --

THE COURT: Looks like you are having -- you have had more children while you have been before me than while you have been --

MS KELLY: Every time I appear before you I want to make sure i am pregnant. But --

THE COURT: That is why your husband keeps having telling you to have cases brought here.

MS KELLY: I am due the first week in June. And so -- but I have people that can fill in for me.

THE COURT: So.

MS KELLY: For a trial date maybe in September would be good.

THE COURT: So let's, why not give you little extra time? Why don't we have your class certification motion due on August 26? That gives you almost three months after the birth of your child.

And then let's set the case for trial October 21 and 22? Do you think it will take longer than two days? These cases never -- either go out on summary judgment or

settle. I haven't had one go to trial yet.

MR. O'NEILL: I have not had a class action go to trial either. If we were to go to the trial the question is, are the plaintiff going to have to prove the legal invalidity of the debt? That might be a little bit complicated.

THE COURT: Well, let's make it three days then.

So we will set it for the 21st and 22nd and 23rd.

All right. We can go adjourn court.

HEARING ADJOURNED

THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

GILBERT FRANK HALASZ, RMR
OFFICIAL COURT REPORTER