**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

WILSON THEODORE and LASHANDA THEODORE, *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v. Civil Action No. 2:23-cv-537-EWH-LRL

TRANS UNION, LLC,

Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**MOTION TO CERTIFY CLASS**

This case concerns the reporting of fraudulent loans that were created by a now-defunct company—Power Home Solar, LLC d/b/a Pink Energy ("Pink Energy")—that declared bankruptcy in the United States District Court for the Western District of North Carolina on October 7, 2022. By now we know that the loans were unlawful, and the reporting of them inaccurate. *In re Dividend Solar Fin., LLC*, No. MDL 24-3128 (KMM/DTS), 2025 WL 2430484, (D. Minn. Aug. 22, 2025) (Denying motion to dismiss, finding that a significant balance of the subject loans was finance charge rather than principal); Ex. 1, *State v. GoodLeap LLC*, No. 27-CV-24-3558 (Minn. Dist. Ct. Hennepin Cnty. July 4, 2025) (Same and finding that the facts support a claim for deception). Equifax has agreed to remove the tradelines from its credit reports. *Theodore, et al v. Equifax Info. Svcs*., ECF 55, Civ. No. 2:24-cv-224-EWH-LRL, ECF 31-1(E.D.Va. Dec. 6, 2024) Experian may shortly. But not Trans Union.

In this motion, Plaintiffs move under Fed. R. Civ. P. 23(b)(3) to certify their claim for trial as a class action. Defendant Trans Union, LLC ("Trans Union"), a consumer reporting agency

("CRA"), blindly accepted the reporting of these Pink Energy loans without any factual or lawful basis to support its reliance upon the Pink Energy lenders (or "Furnishers"). On behalf of a class of similarly situated persons, Plaintiffs seek relief under the Fair Credit Reporting Act (the "FCRA") relating to the reporting of those loans because Trans Union failed to "follow reasonable procedures to assure maximum possible accuracy of the information" that it included in Plaintiffs' credit reports. 15 U.S.C. § 1681e(b). Trans Union will not seriously defend the reported loans themselves. Instead, it will argue that it did not know better. That it was entitled to trust and assume as true the reporting of its customers. We will have that fight later in the case. But at present, there really are no significant facts in dispute on the question of class certification. It is indisputable that the illegality and inaccuracy of these Pink Energy loans and the availability of Trans Union's "reliable furnisher" defense are common questions best answered on a class basis.

## I. FACTUAL BACKGROUND

Most of the facts material to this motion are undisputed. Trans Union is a consumer reporting agency governed by the FCRA. (Am. Compl. ¶ 14, ECF No. 25; Answer ¶ 14, ECF 50) In that role, furnished credit reports regarding Plaintiffs and the putative class. Trans Union credit reports about the Plaintiffs that included a tradeline "account supposedly opened by and owed to: "CROSS RIVER BANK C/O SUNLIGHT FINANCIAL 1939" and "was reported as a 'Secured Home Improvement' account or loan." (Am. Compl. ¶ 28; Answer ¶ 28)(Ex. 2, Plaintiffs' Consumer Reports Exemplars).

Plaintiff alleges that it "blindly accepted the reporting of loans fraudulently created by now bankrupt [Pink Energy] and [its] closely connected lending partners." (Am. Compl. ¶ 2.) The Pink Energy loans arose "from a scheme" that used "deceptive sales practices to defraud thousands of consumers into signing scam loans to pay tens of thousands of dollars each in connection with

their supposed purchase of functional rooftop solar systems." (*Id.* ¶ 39.) In fact, "thousands of consumers like Plaintiffs" became victims of Pink Energy's unlawful and deceptive sales practices and are now considered to be on the hook for tens of thousands of dollars in loans. (*Id.* ¶ 41.)

Plaintiffs did not simply purchase defective products but "were victimized by a connected scheme between five lending partners and Pink Energy to attempt to separate the fraud from the loan instruments, with these Pink Energy lending partners conspiring and working with Pink Energy to inflate the loans, mislead consumers as to the actual 'price' (known by everyone but the consumer to be false) and to circumvent federal and state consumer lending protections." (*Id.* ¶ 42.) These "loans" were in fact "created as a way to sell—usually door-to-door or by phone—supposed solar panel systems." (*Id.* ¶ 3.) These "loans" were "grossly inflated and not such to conform with ordinary consumer credit instruments more typically reported through Trans Union." (*Id.*)

None of this was a secret. "[M]any lawsuits" were filed about these issues, including by at least one Attorney General. (*Id.* ¶ 40.) The lender's partner, Pink Energy then filed bankruptcy in the face of these many lawsuits and "investigations by many more Attorneys General." (*Id.*) Thereafter,

> Numerous Attorneys General—including Virginia's own—sent letters to Pink Solar's lending partners demanding that those creditors who work with Pink Energy as its financing side, including Sunlight Financial LLC ("Sunlight"), Dividend Solar Finance LLC, GoodLeap, LLC, and Solar Mosaic, Inc. (collectively, the "Pink Energy Partners"), cease asserting those victimized consumers' fraudulent payment obligations.

(*Id.* ¶ 4.) "When they discovered the interconnections between the lending partners and Pink Energy, the Virginia Attorney General and other Attorneys General notified each of these parties that the Pink Energy loans should be suspended and would not be lawfully enforced." (*Id.* ¶ 43.)

Plaintiffs make no allegation (and thus none can be assumed at this posture) that the Pink Energy lenders were reliable sources, or that Trans Union had any basis to even accept them as

furnishers. Nevertheless, Trans Union accepted them as "furnishers" and "blindly" reported "verbatim" whatever they instructed. (*Id.* ¶ 2.). Trans Union "chose to allow" sham furnishers "to continue to report these debts on Plaintiffs' and putative class members' credit reports in order to coerce repayment of these Pink Energy based debts." (*Id.* ¶¶ 5, 47.)

## II. ARGUMENT

### A. Plaintiffs' Claim Satisfies Each of the Elements of Rule 23(a)

Plaintiffs seek to certify a class defined as follows:

> All persons residing in the United States (1) for whom Trans Union furnished a consumer report; (2) on or after January 1, 2023 and through March 8, 2024; and (3) containing an account where the loan was arranged by one of the Pink Energy Partners; and (4) the account pertains to a consumer's purchase of products and/or equipment from Pink Energy.[1]

Plaintiffs have narrowed the class period within the definition for reasons stated in support of their Motion for Leave to File Second Amended Complaint (ECF 65).[2] It ends on the date before Trans Union would have had notice of the filing of the action by the Minnesota Attorney General. Ex. 3, *State v. GoodLeap LLC*, No. 27-CV-24-3558 (Minn. Dist. Ct. Hennepin Cnty. March 7, 2024)(Complaint).

#### 1. The Class is numerous.

---

[1] Excluded from the sub-class definition are any employees, officers, directors of Defendant, any attorney appearing in this case, any person employed by the Federal Judiciary, and all persons who have signed a written release of his or her claim.

[2] Plaintiff suggests the Court certify these definitions, which refine and narrow those pled in order to comport with documents and testimony Defendant itself has disclosed after the date of Second Amended Complaint. As the Court understands, the class definition is not confined to the proposal within the Second Amended Complaint. *Henderson v. Corelogic Nat'l Background Data, LLC*, No. 3:12-cv-97, 2016 WL 4611571, at *4 (E.D. Va. Sept. 2, 2016) (citing with approval cases so holding in the context of a motion to strike proposed subclasses). "Courts in every circuit have held, when a class definition is not acceptable, judicial discretion can be utilized to save the lawsuit from dismissal. Indeed, several circuits have held that a court should alter the class definition in lieu of rejecting class certification, if possible." § 7:27. Defining the class—Judicial discretion to ensure satisfactory class definition, 3 Newberg and Rubenstein on Class Actions § 7:27 (6th ed.)

**a. Numerosity**.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity hurdle is not a high one, as joinder of a class population of 18 or more is presumptively impracticable. *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967) (finding that 18 class members was sufficient to fulfill the numerosity requirement). See also *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *7 (E.D. Va. Mar. 1, 2017)("[J]oinder usually becomes impracticable where the class exceeds 40 members[.])(citation omitted); WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:11 (5th ed. 2013) ("[J]oinder is generally deemed practicable in classes with fewer than 20 members and impracticable in classes with more than 40 members.").

"[I]t is well settled that a plaintiff need not allege the exact number or specific identity of proposed class members." Newberg on Class Actions § 3:13 (5th ed.). Trans Union has stipulated to numerosity. ("Rule 23 Stipulation", ECF 63-1 at C). The Court also has the benefit of the nearly identical class result in *Theodore, et al v. Equifax Info. Svcs*., ECF 44, Civ. No. 2:24-cv-224-EWH-LRL E.D.Va. May, 7, 2025) (Decl. of American Legal Claims)[3]. The class was in excess of 29,000 consumers.

**b. Trans Union and Accessible Third-Party Records Allow for Mechanical Identification of an Ascertainable Class**.

Although not specifically mentioned in Rule 23, courts have held that a class must be ascertainable. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014).[4] The purpose of the

[3] Ex. 4

[4] Most "Identifiability" issues that could be at issue in a case like this one would be better characterized as a manageability question considered under Superiority. *Mullins v. Direct Digital, LLC,* No. 15-1776, 2015 WL 4546159, at *3 (7th Cir. July 28, 2015). However, Plaintiff here follows the sequence and structure used in EQT

implied ascertainability requirement "is not to 'identify every class member at the time of certification,' but to define a class in such a way as to ensure that there will be some 'administratively feasible [way] for the court to determine whether a particular individual is a member' at some point." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019). (quoting *EQT*, 764 F.3d at 358).

Easy things first, Trans Union has stipulated that it can accomplish nearly all of the steps necessary to identify a class. ECF 63-1, Rule 23 Stipulation at A. Trans Union "possesses the data and information necessary to identify those persons who would satisfy the first three of the four elements of Plaintiffs' Proposed Class Definition", including whether a consumer report was furnished, when it was furnished and whether it contained one of the defined tradelines.

The only item Trans Union claims it cannot determine is whether "the account pertains to the consumers' purchase of products and/or equipment from Pink Energy." *Id*. at B. That of course is not a disputed element as each of the Pink Energy Lenders have already confirmed they can produce their data sufficient to satisfy that component. See e.g. *Theodore, et al v. Equifax Info. Svcs*., ECF 55, Civ. No. 2:24-cv-224-EWH-LRL (E.D.Va. August 18, 2025) (Status Report of Equifax and Theodores) ("To date, Dividend Solar Finance LLC/Fifth Third Bank, N.A., Sunlight Financial, LLC, and Goodleap, LLC have each responded to Plaintiffs' subpoenas and have provided Equifax with sufficient information to identify the tradelines that are subject to deletion under the settlement.")[5]; Ex. 5, Decl. of Leonard A. Bennett, ¶ 29. It is not controversial or contestable that Trans Union's customer Furnishers have a record of where the identity of their debtors and the transaction from which the loan originated. In fact, if such information was not so

[5] Except for the Solar Mosaic data, the consumer lists and data was produced under the Protective Order in the *Equifax* case. The Solar Mosaic data has been reproduced to Trans Union after the subpoena response in this case.

possessed, Trans Union's credit reporting would have much greater problems and FCRA exposure.

A digital search process, perhaps with an additional manual review, is a process particularly well-suited to a database business like Defendant's, the very purpose of which is to gather, distill, and report information. *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197 (E.D. Va. 2015). In language entirely applicable sub judice, Judge Payne rejected the any challenge theoretically assertable by a CRA such as Trans Union:

> The number of "steps" in the process and the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable. See *Dunnigan v. Metro. Life Ins. Co.*, 214 F.R.D. 125, 136 (S.D.N.Y.2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement."). Moreover, the majority of sifting in this case will be achieved through dataset searches and other forms of electronic data analysis. …[T]his recourse to manual, member-by-member review [does not] render the inquiry "subjective." Here, most of the determinations are readily discernible and almost always binary: an individual was either listed as subject to a judgment or was not; this judgment was either recorded by Equifax or was not; Equifax either received a communication from the individual or did not; and so on.

*Id*.

While identification is often difficult and only a theoretical burden at this posture, Plaintiffs have gone well beyond their proof responsibilities and, in the *Equifax* case and here, have shown how the actual class list can be identified. "[T]he class does not have to be so ascertainable that every potential member can be identified at the commencement of the action. . . . If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." 7A FED. PRAC. & PROC. CIV. § 1760 (3d ed.). Still, while likely not yet perfect given the limitations at this posture, Trans Union cannot in good faith dispute that a sufficiently numerous class can be identified and ascertained.

**2. There are common questions linking Class Members.**

Rule 23(a)(2) requires that the court find that there are questions of law or fact common to

the class, but complete congruence of those questions is not necessary. *Lienhart v. Dryvit Sys. Inc.,* 255 F.3d 138, 146 (4th Cir. 2001); *Centr. Wesleyan Coll. v. W.R. Grace & Co*., 143 F.R.D. 628, 636 (D.S.C. 1992) *aff'd*, 6 F.3d 177 (4th Cir. 1993). "Commonality is satisfied where there is one question of law or fact common to the class, and a class action will not be defeated solely because of some factual variances in individual grievances." *Jeffreys v. Commc'ns Workers of Am., AFL-CIO*, 212 F.R.D. 320, 322 (E.D. Va. 2003). More recently, the Fourth Circuit has restated the standard for commonality, based upon the Supreme Court's clarification of the concept:

> Commonality is generally established when a Plaintiff's claims have "questions of law or fact common to the class." As the Supreme Court recently clarified, in order to satisfy the commonality requirement, the plaintiff must "demonstrate that the class members 'have suffered the same injury,'" and that the claim "depend[s] upon a common contention" that "is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Gray v. Hearst Commc'ns., Inc.*, 444 F. App'x 698, 700–01 (4th Cir. 2011) (citations omitted). "Rule 23(a)(2) 'does not require that all, or even most issues be in common.' A single common question will satisfy Rule 23(a)(2)'s commonality requirement." *Adair v. EQT Prod. Co.*, No. 1:10-CV-00037, 2013 WL 5429882, at *35 (W.D. Va. Sept. 5, 2013) *report and recommendation adopted as modified sub nom*., *Hale v. CNX Gas Co., Inc.*, No. 1:10CV00059, 2013 WL 5429901 (W.D. Va. Sept. 30, 2013) (internal citations omitted). "A point of commonality must be specific—and relevant—enough that it could help form the basis for the success of an individual claim." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 200 (E.D. Va. 2015).

This Court has ample experience with commonality in the FCRA context as "FCRA cases … have repeatedly been held to satisfy the commonality requirement of Rule 23(a)(2)." *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *9 (E.D. Va. Mar. 1, 2017). In 2014, in another heavily contested § 1681e(b) case, the Court certified an FCRA class action against

Equifax. *See Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 191 (E.D. Va. 2015). There, the Court defined the core commonality issues as "the inaccuracy of the consumer reports, the reasonableness of the procedures alleged to cause these inaccuracies, whether Equifax's conduct was willful, and the determination of statutory damages." *Id.* at 201.

**a. Inaccuracy is a Common Question**

Plaintiffs allege two common bases for finding the reporting of the Pink Energy loans inaccurate. First, Plaintiffs allege for themselves and each class member that the Pink Energy loans are void and illegal. All of the Pink Energy lenders follow the same unlawful method. "Consumers are unaware of Defendants' upfront fees because Defendants do not allow sales companies to identify such fees in sales proposals and do not calculate such fees in advertised APRs or otherwise disclose the fees as finance charges. Instead, Defendants require [] solar companies to hide the fee in the stated price of the financed system." *State v. GoodLeap LLC*, Complt., ¶ 29.

Second, regardless of whether the loans themselves are void, they are patently inaccurately reported. Dictionaries variously define "accuracy" to mean "freedom from mistake or error."[6] The Second and Eleventh Circuits have relied on such dictionary definitions to define accuracy. *See Mader v. Experian Info. Sols.*, 56 F.4th 264, 269 (2d. Cir. 2023) ("Because the term 'accuracy' is not defined in the FCRA, we look to its ordinary meaning found in 'contemporary dictionary definitions' from 1970 when the FCRA was enacted."); *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1251–1252 (11th Cir. 2020) (accuracy means "freedom from mistake or error," citing Webster's Third New International Dictionary). The Court of course has already explained that "A report is inaccurate when it is patently incorrect or when it is misleading in such

[6]Merriam-Webster Online Dictionary (2021), https://www.merriam-webster.com.

a way and to such an extent that it can be expected to have an adverse effect" and at "the very least, information that is inaccurate 'on its face', is 'patently incorrect.'" Memorandum Order, ECF 49 at 9 (quotations and citations omitted).

As Trans Union has been previously told, accuracy "requires congruence between the legal status of a consumer's account and the status a CRA reports." *Crane v. Trans Union, L.L.C.*, 282 F. Supp. 2d 311 (E.D. Pa. 2003). *See also Miller v. Trans Union, L.L.C.*, 2013 WL 5442008 (M.D. Pa. Aug. 14, 2014) (quoting *Crane v. Trans Union*), adopted in part, 2013 WL 5442059 (M.D. Pa. Sept. 27, 2013). This is consistent with the CFPB's regulatory definition of "accuracy" for furnishers. "Accuracy means that information that a furnisher provides to a consumer reporting agency about an account or other relationship with the consumer correctly … (1) Reflects the terms of and liability for the account or other relationship[.]" 12 CFR §1022.41(a) (in relevant part).

Trans Union's reporting did not accurately state the status and terms of the Pink Energy loans. In each instance, the loans of the Furnishers inflated the principal and included a finance charge that was not permitted by the form contract. "Simply put, [the Pink Energy Furnishers] deceive consumers by charging a hidden and costly upfront fee that they add into the stated price of each financed system while falsely telling consumers that the inflated price only reflects the system's cost rather than financing." *State v. GoodLeap LLC*, Complt., ¶ 15. For example, on page 1 of the Theodores' contract the lender incorporated the Truth in Lending Disclosures into the contract itself. It states that $64,911.00 was "[t]he amount of credit provided to you on your behalf." This number shows up as the high balance on all of the reporting on the account. This amount was not the amount of credit provided to each of the Theodores. The contract documents, including the Summary of Key Loan Terms, make plain that the credit is provided to pay for the installation of a residential solar power system. A simple fact question to the lender is what amount

of money was provided to the installer for the solar power system. The answer is that in every instance it was far less than the amount disclosed on the credit contract. The actual high balance was less, and was less by the amount not disbursed to the installer. The balance could only be the amount actually disbursed to the installer.

Thus, starting with the wrong initial balance, the reporting is inaccurate because interest was improperly assessed under the objectively knowable text of these form contracts. On page 5 of the contract under "INTEREST; PROMISE TO PAY" the Theodores agreed to pay the "actual Amount Financed" with interest to be assessed "on the unpaid balance of the Amount Financed from time to time commencing on the date of the initial payment made by us to the Contractor[.]." Because the actual Amount Financed was far less than $64,911, improper interest was charged every month. Thus, the balance reported each month was wrong and each month the amount by which it was wrong increased.

Further, the contracts were falsely reported as a "Secured Home Improvement Loan," which in the credit reporting industry means a home improvement loan secured by the consumers' home.[7] In fact, "Home Improvement Loan" is a defined term of the Home Mortgage Disclosure Act (HMDA) (12 U.S.C. 2801 et seq.). See 12 C.F.R. § 1003.2(i) (2024). Trans Union's colleague Experian, explains in *How Do Home Improvement Loans Work*?, "You can use either secured or unsecured loans for home improvements. A secured loan, such as a home equity loan, home equity line of credit (HELOC) or cash-out refinance, requires collateral. In these cases, your home serves as collateral for the money you borrow, and the lender may be able to foreclose on your home if

---

[7] If it was actually a loan secured by the residence, the Truth in Lending Disclosure would have to state so and in such instances provide the TILA disclosures about the right to cancel and also not contain any arbitration clause. Therefore, reporting a loan secured by personal property as a loan secured by a home was inaccurate.

you can't repay the money."[8]

Trans Union may not concede that these three reporting outcomes were "inaccurate" under the FCRA. But that question is common and such that answering it favorably would advance the case of all class members.

**b. "Reasonable procedures" is a Common Question.**

"To meet the second element of a § 1681e(b) claim" a consumer "must demonstrate that 'the reporting agency did not follow reasonable procedures to assure maximum possible accuracy.'" *Soutter*, 307 F.R.D. at 202 (quoting *Dalton v. Cap. Associated Indus., Inc.,* 257 F.3d 409, 415 (4th Cir. 2001). "[A] 'reasonableness' determination regarding procedures is only 'individualized' if the procedures in question actually varied by individual." *Id*. Here, Plaintiffs argument is as to Trans Union's systems generally. It has no procedure to vet, measure, evaluate or investigate its paying customers when they report data to its reports. It should have known of red flags of unreliability. (Am. Compl. ¶ 30, 31, 36, 43, 44, 46, 47.) As the Court summarized, "Plaintiffs contend that Trans Union systematically "ignore[ed] inconsistent information it received from consumer disputes, Attorneys General correspondence and public statements, and widespread press coverage of the Pink Energy accounts and deferred instead to contradictory and unverified information reported by automated transmission from its paying subscribers, the Pink Energy partners." Mem. Order, ECF 49 at 4.

There is no admissible or even implied evidence to suggest otherwise. When asked in discovery to "State, describe in detail and identify all documents that support your contention that the Pink Energy Partners are reliable sources of credit reporting", Trans Union could only answer,

[8] Preempting one possible argument – to the extent not every class member was reported with the same "Secured Home Improvement" code and that is the only inaccuracy that is subject to the Rule 23 Order, the Court would properly certify a narrowed class or subclass.

"Trans Union refers Plaintiffs to the documents produced (or which will be produced) in this lawsuit by Trans Union. Investigation continues." Ex. 6, Trans Union Responses to Plaintiff Wilson Theodore's First Set of Interrogatories ("Ints."), No. 2. No meaningful documents were produced as to this request other than identity verification credentialing documents. When asked to "Identify all processes at Trans Union for monitoring events and public news regarding its furnisher customers", Trans Union could only respond, "Trans Union states that investigation continues." Ints. No. 5. And asked to "Identify any policies and procedures in effect from January 1, 2020 to the present for your compliance with 15 U.S.C. § 1681e(b)", Trans Union responded only, "Trans Union states that investigation continues." *Id.*, No. 10.

Trans Union has throughout this case continued to ignore the requirement that it provide some evidence that it had a reasonable basis to treat the Pink Energy Lenders as "presumptively reliable." Neither financial institutions nor lenders are presumptively reliable merely because of the nature of their business:

> The Court is not persuaded by Defendant's argument that there is a "presumption" in the law that financial institutions are reliable. Rather, the Eleventh Circuit Court of Appeals adopted "two corollary principles." The first principle, to which Defendant refers, that "a reporting agency's procedures will not be deemed unreasonable unless the agency has a reason to believe that the information supplied to it by a data furnisher is unreliable," is narrowed by the corollary principle that "when a CRA . . . has been notified of potentially inaccurate information in a consumer's credit report, it is in a very different position than one who has no such notice.'" Because the parties here both agree that Defendant received Plaintiff's dispute letter, Defendant finds itself in the position of a CRA with "a reason to believe that the information supplied to it by its data furnisher is unreliable." As such, Defendant cannot argue that the first principle applies to render Defendant's procedures presumptively reasonable or the data produced by Nationstar presumptively accurate.

*Losch v. Experian Info. Sols., Inc.*, 2022 WL 17823664, at *8 (M.D. Fla. May 17, 2022) (cleaned up). Consumer reporting agencies cannot accept tradelines blindly and assume them accurate absent an initial vetting and investigation, even if less heightened than upon a consumer dispute.

As the Court has explained:

> While neither Section 1681e(b) nor 1681i(a)(1)(A) uses the term "investigation," it is clear from their explicit requirements that the obligation to conduct an investigation or reinvestigation that is reasonable under the circumstances is central to Experian's duty of care under the FRCA. This conclusion flows from the plain meaning of both sections. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived ..." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-CV-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011). That is especially so in circumstances, like here, when the consumer reporting agency had notice of consumer disputes and other systemic problems. *See, e.g.*, *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971–72 (7th Cir. 2004); *Aslani v. Corelogic Credco, LLC*, 2014 WL 12861199, at *4 (N.D. Ga. Aug. 18, 2014), *report and recommendation adopted*, 2014 WL 12861361 (N.D. Ga. Sept. 8, 2014).

The question of what procedures Trans Union followed in vetting its sources and monitoring same for issues as here will be the same for each class member. "At the heart of this case is a simple question: whether [Trans Union] had 'reasonable procedures to ensure maximum possible accuracy' of its reports. That question is common to every member of the proposed class, as [Trans Union] concededly employed the same procedures to all. Rule 23(a)(2) requires no more." *White v. First Am. Registry*, 230 F.R.D. 365, 367 (S.D.N.Y. 2005). *See Soutter*, 307 F.R.D. at 205 (finding consumer reporting agencies' procedures to "raise a common contention of reasonableness that can be resolved with common answers on a classwide basis"); *McIntyre v. RealPage, Inc.*, 336 F.R.D. 422, 434–35 (E.D. Pa. 2020) (a CRA's procedures to investigate and

vet its sources are the key common issues); *Feliciano v. CoreLogic Rental Property Solutions, LLC*, 332 F.R.D. 98, 106 (S.D.N.Y. 2019) (finding "whether defendant followed reasonable procedures to ensure the accuracy of its records" to be a common question).

This is another common question.

**c. Willfulness is a Common Question**

Whether Defendant's violations of the FCRA were "willful" remains a common question answered only with common evidence. *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (discussing as "the qualitatively overarching issue" the "liability issue of the defendant's [FCRA] willfulness"); *Henderson v. Trans Union LLC*, No. 3:14-CV-00679-JAG, 2016 WL 2344786, at *3 (E.D. Va. May 3, 2016) ("The common questions in this case include whether Trans Union's process for sending PEER Letters violates § 1681k and whether Trans Union's violation, if any, was willful."); *Manuel v. Wells Fargo Bank, Nat. Ass'n*, No. 3:14CV238, 2015 WL 4994549, at *10 (E.D. Va. Aug. 19, 2015) ("[T]his Court has held that "[t]he question of willfulness is also a common question . . . [when] [t]here is no contention that [Defendant's] state of mind as to individual consumers varied in any way."); *Soutter*, 307 F.R.D. 206 (E.D. Va. 2015).

**3. Plaintiffs' claims are Typical of those of Class Members.**

A class representative's claims or defenses must be "typical" of the claims or defenses of the class. FED. R. CIV. P. 23(a)(3). The Fourth Circuit has described the typicality requirement as "the heart of a representative [party's] ability to represent a class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). Typicality demands "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.*; *accord Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 264 (4th Cir. 2012); *Lienhart*, 255 F.3d at 146.

The Plaintiff's interest in prosecuting her case must advance the interests of the Class. *Soutter*, 498 F. App'x at 264. Moreover, class representatives must not have an interest that is antagonistic to that of the class members. *Rodger v. Elec. Data Sys. Corp.*, 160 F.R.D. 532, 538 (E.D.N.C. 1995). The essence of typicality is that: "as goes the claim of the named plaintiff, so go the claims of the class." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998); *accord Deiter*, 436 F.3d at 466; *Soutter*, 498 F. App'x at 264. Nonetheless, typicality does not require that a class representative's claims be perfectly identical to the class members' claims. *See, e.g.*, *Broussard*, 155 F.3d at 337; *Deiter*, 436 F.3d at 467; *Soutter*, 498 F. App'x at 265; *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009). Rather, "the interests of the party representing a class must be substantially similar to those of the unrepresented parties." *In re Mills*, 257 F.R.D. 101, 105 (E.D. Va. 2009); *see also In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006). However, "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification." *In re BearingPoint*, 232 F.R.D. at 538.

As the Fourth Circuit set out the typicality analysis in *Soutter*:

> To determine if [Plaintiffs] ha[ve] shown typicality, we compare [their] claims and the [CRA]'s defenses to [their] claims with those of purported class members by reviewing the elements of [Plaintiffs'] prima facie case and the fact supporting those elements and examining "the extent" to which those facts "would also prove the claims of the absent class members."

*Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 265 (4th Cir. 2012) (citing *Deiter*, 436 F.3d at 467). Applying the Fourth Circuit's roadmap, Plaintiff's claim and facts are clearly typical of the putative Class's claims and facts. As the Fourth Circuit held, "Soutter's claim under § 1681e(b) requires her to prove that:

> (1) her credit report was inaccurate;
> (2) Equifax's unreasonable procedures caused the inaccuracy; and

(3) Equifax's behavior was willful."

*Id*. (numbered structure added). This case is that simple. As addressed above, each of these elements is uniform and the same across the Class.

By nature of the Class definition and the alleged inaccuracy, every putative Class Member is in the exact same circumstance. Second, Plaintiff must prove that Defendant did not follow "reasonable procedures to ensure maximum possible accuracy." 15 U.S.C. §1681e(b). As discussed above, the same proof is the same across class members. In fact, in this case, Defendant has stipulated that it will not "support its opposition to the Rule 23 motion with data and information in order to demonstrate differences material to class certification among putative class members." Rule 23 Stip., ECF 63-1 at D. The procedures Trans Union followed are the same as to the Plaintiffs as they are to all class members.

Lastly, Plaintiff will need to prove that Defendant's violations were willful. As addressed regarding Commonality, the facts and arguments to be offered by the Plaintiff are typical of those that will be offered on behalf of the Class. "The question then is whether, as to the common procedures outlined above" Plaintiffs' "evidence will help demonstrate that" Trans Union "was conscious that its procedures (or lack thereof) 'ran a risk of violating the law substantially greater than the risk associated with a reading [of the law] that was merely careless.' Safeco, 551 U.S. at 69, 127 S.Ct. 2201. The Court finds that a reasonable jury could come to such a conclusion based upon the proof that Soutter uses to advance her own claim." *Soutter* at 211.

**4. Plaintiffs and their Counsel will adequately represent the interests of the Class.**

The final component of Rule 23(a) requires that the "representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). This prerequisite is met when: "(1) the named plaintiff[s] [have] interests common with, and not antagonistic to, the Class'

interests; and (2) the plaintiff[s'] attorney is qualified, experienced and generally able to conduct the litigation." *In re Se. Hotel Props. Ltd. P'ship Investor Litig.*, 151 F.R.D. 597, 607 (W.D.N.C. 1993); *Wiseman v. First Citizens Bank & Trust Co.*, 212 F.R.D. 482, 489 (W.D.N.C. 2003). Representation will be considered "adequate" if the class representatives are not disqualified by reason of interests antagonistic to the rest of the class. *Ostrof v. State Farm Mutual Auto. Ins. Co.*, 200 F.R.D. 521, 530 (D. Md. 2001).

"The burden is on the defendant[] to demonstrate that the representation will be inadequate." *Johns v. Rozet*, 141 F.R.D. 211, 217 (D.D.C. 1992); *see also In re Se. Hotel Props.*, 151 F.R.D. at 607; *Lewis v. Curtis*, 671 F.2d 779, 788 (3rd Cir. 1982); *Trautz v. Weisman*, 846 F. Supp. 1160, 1167 (S.D.N.Y. 1994). To defeat the adequacy requirement of Rule 23, a conflict "must be more than merely speculative or hypothetical." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003) (citing 5 MOORE'S FEDERAL PRACTICE § 23.25[4][b][ii] (2002)). Defendants cannot possibly satisfy that burden. Plaintiff's Counsel are experienced in class action work as well as consumer protection issues under the Fair Credit Reporting Act, and have been approved as class counsel in numerous cases before this Court.[9] "This Court has repeatedly found that Clark's counsel is qualified to conduct such litigation. . . . This Court echoes the sentiments previously stated about Clark's counsel because they pertain here with equal vigor." *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *13 (E.D. Va. Mar. 1, 2017) (collecting cases, citations omitted). Trans Union has not contested this issue. Answer 50, ¶ 79.

Further, Plaintiffs themselves do not have any interests antagonistic to those of the proposed Class and have cooperated with their counsel and pursued this litigation vigorously to redress the wrongs alleged. (Ex. 5, Decl. Bennett at ¶ 27; Ex. 7, Decl. Wilson Theodore, ¶¶ 22-28,

[9] The concurrently filed Declaration of Leonard A. Bennett sets forth proposed Class Counsel's experience and ability to serve as Class Counsel. (Ex. 5.)

; Ex. 8, Decl. Lashanda Theodore, ¶¶ 22-28.) Named Plaintiffs and the proposed Class share an identical interest in establishing Defendant's liability. To establish liability, all members of the proposed Class seek the same findings on the common questions of law and fact. No apparent or even imagined antagonism exists between the Named Plaintiffs and the members of the putative Class.

**B. The Class Likewise Satisfies The Requirements Of Rule 23(b).**

Under Rule 23(b)(3), an action that satisfies the threshold prerequisites for certification may be maintained as a class action if the court finds that: (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). Plaintiffs' claims satisfy those requirements.

**1. Classwide issues will predominate over any individual ones.**

Rule 23(b)(3) requires that the questions of law or fact common to all members of the class predominate over questions pertaining to individual members. *Lienhart*, 255 F.3d at 142; *Simmons v. Poe*, 47 F.3d 1370, 1380 (4th Cir. 1995). The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Gariety v. Grant Thornton, LLP,* 368 F.3d 356, 362 (4th Cir. 2004) (citing *Amchem Prods.*, 521 U.S. at 623–24); *Lienhart*, 255 F.3d at 142. This criterion is normally satisfied when there is an essential common factual link between all class members and the defendants for which the law provides a remedy. *Talbott*, 191 F.R.D. at 105 (citing *Halverson v. Convenient FoodMart, Inc.*, 69 F.R.D. 331 (N.D. Ill. 1974)). "[T]he question of a [FCRA defendant's] liability represents the central, dominant issue before the Court, and while some questions may exist as to how to best apportion statutory damages, those questions do not preclude the common issue of liability from predominating."

*Dreher*, 2014 WL 2800766, at *2–3. As the Fourth Circuit explained in reversing denial of certification in a FCRA case:

> Where, as here, the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3).

*Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 273 (4th Cir. 2010).[10] In fact, the Court's first decision on class certification is one of the only ones from this court finding that individual determinations may predominate over the determination of FCRA liability and willfulness. *See, e.g. Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *15 (E.D. Va. Mar. 1, 2017) (Lauck) ("The dominant issue before the Court is the ultimate question of liability: whether Trans Union willfully failed to disclose as its source the third-party public records vendor, LexisNexis, in violation of § 1681g(a)(2). This alone, as the qualitatively overarching issue of this case, satisfies the predominance requirement and outweighs any issues particular to individual class members."); *Henderson v. Trans Union LLC*, No. 3:14-CV-00679-JAG, 2016 WL 2344786, at *5 (E.D. Va. May 3, 2016) (Gibney) ("In this case, the question of whether Trans Union's process for sending PEER Letters violates § 1681k predominates over questions affecting only individual members. Trans Union argues that this question "not only does not predominate, it is flatly irrelevant because the answer cannot drive the class-wide resolution of liability in this case. The Court disagrees. "); *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 216 (E.D. Va. 2015) ("Rather, the *primary*

---

[10] This conclusion was more recently affirmed in *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013) (Reafiirming the conclusion in *Stillmock v. Weis Markets, Inc.*, "that where 'the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3).'"

*lesson* of *Stillmock* was that simple or formulaic statutory damages determinations do *not* outweigh more qualitatively weighty common questions, such as willfulness. *See Stillmock,* 385 Fed.Appx. at 273; *see also Ealy,* 514 Fed.Appx. at 305 (citing *Gunnells* for the proposition that "common issues of liability may still predominate even when some individualized inquiry is required" and citing *Stillmock* as an example); *Dreher,* 2014 WL 2800766, at *2 ("[E]ven though *Stillmock* raised questions involving the award of statutory damages, the predominant issue remained the question of liability."). As such, this Court relies upon the lessons of *Stillmock* and *Soutter II* in finding that willfulness is a common—and qualitatively predominate—question.")

As established above and just as in the comparable *Soutter* § 1681e(b) case, "individualized proof will not be necessary, because the members of the class can all demonstrate" the incompleteness "of their reports by reference to common evidence: the OES database." *Soutter*, 307 F.R.D. at 201. In this case, again like in *Soutter*, Plaintiffs have shown that class members can be identified through the simple comparison of the data fields in the files of Trans Union and its Pink Energy Furnishers. And liability is entirely a common set of issues.

**2. A class action is the superior method to resolving these claims.**

The hallmark of superiority is efficiency, with the Court looking "to judicial integrity, convenience, and economy" in the analysis. *Talbott v. GC Servs. Ltd. P'ship*, 191 F.R.D. 99, 106 (W.D. Va. 2000). The Court should also consider the "'inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually.'" *Id.* (quoting *Citifinancial v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164 (7th Cir. 1974)). This Court has found superiority to exist in cases where, like here, thousands of proposed class members press "identical, fairly small claims for relief," and who would be unlikely to pursue them if forced to do so individually. *Williams v. LexisNexis Risk*

*Mgmt. Inc*., CIV A 306CV241, 2007 WL 2439463, at *9 (E.D. Va. Aug. 23, 2007).

This reality is of even more force in this case, as Class Members would not even know of their claims because LexisNexis' business model is that it operates "behind the scenes" and denies publicly even the applicability of the FCRA. It never sends 1681k(a)(1) notices, wholly defeating a key method for consumers to learn of its existence.

It is more efficient, by that reckoning, to have a thousands of separate lawsuits over the question of whether Defendant's reports are "consumer reports", pursuing the same discovery, deposing the same witnesses, and arguing the same motions in front of multiple judges in different districts than to resolve all of those claims right here and now, in this Court. Defendant's favored outcome completely defeats the efficiency and economy that class actions provide, particularly now that Plaintiffs have greatly streamlined the proposed Class and, as set forth above, shown that class treatment is appropriate. There can simply be no genuine argument that individual litigation is even feasible. It is entirely unrealistic to expect that even amongst that small number, any lay consumers could determine on their own that they had satisfied each of the elements of this claim as now understood by the Parties and the Court.

These facts mean, of course, that the alternative to class litigation is *no* litigation. This case is typical of FCRA cases where superiority is attained because "[t]he potential class members' claims for statutory damages are small when considered in comparison to the effort it would take to assert them in court." *Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 425 (E.D. Va. 2016). But even if individual litigation could even be pursued, separately from the designed inability to learn of Defendant's business systems – systems even in this case it demands be filed under seal - the large majority of Class Members would be unable to learn of their claims because of the complexity of the FCRA. *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *16 (E.D. Va. Mar.

1, 2017) ("[A] class action could provide redress to claimants who, as a result of the technical nature of Trans Union's violation, might not otherwise know the existence of their respective claims."); s*ee also Bonner v. Team Toyota, LLC*, No. 2:06cv157 PRS, 2006 WL 3392942, at *5 (N.D. Ind. Nov. 21, 2006) ("[M]any of the persons in these classes may be unaware that the form letter sent by Defendants may violate the FCRA, and a class action suit may help to safeguard their rights."); *White v. Imperial Adjustment Corp.*, No. Civ.A. 99-3804, 2002 WL 1809084, at *16 (E.D. La. Aug. 6, 2002) ("Because . . . individual putative class members may not be aware of the violation of their [FCRA] rights, it appears improbable that the putative class members would possess the initiative to litigate their claims individually.").

This leads to an additional issue, which the Court recognized in *Thomas*—there are strong *disincentives* for plaintiffs to sue individually. *Thomas*, 312 F.R.D. at 425–26. *See also Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010) ("Weis Markets argues that the availability of attorney's fees and punitive damages under FCRA makes individual lawsuits feasible. Weis Markets' argument is without merit. First, the low amount of statutory damages available means no big punitive damages award on the horizon, thus making an individual action unattractive from a plaintiff's perspective. Second, there is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of FCRA by individual actions of a scale comparable to the potential enforcement by way of class action."); *Clark v. Trans Union, LLC*, No. 3:15CV391, 2017 WL 814252, at *16 (E.D. Va. Mar. 1, 2017) ("[A] class action gives claimants incentive to pursue claims that otherwise would not be worth pursing in light of the insignificant damages that could be recovered.").

## III. CONCLUSION

The proposed class meets the requirements of Rule 23(a) as well as Rule 23(b)(3). On this basis, the Plaintiffs respectfully move that the Court grant their Motion for Class Certification.

Respectfully submitted,
**PLAINTIFFS**

By: /s/ *Leonard A. Bennett*

Leonard A. Bennett, VSB #37523 Thomas Domonoske, VSB #35434 Mark C. Leffler, VSB #40712 Adam W. Short, VSB #98844 John Maravalli, VSB #99000 CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A Newport News, Virginia 23601
Telephone: (757) 930-3660
Fax: (757) 930-3662
Email: tom@clalegal.com
Email: lenbennett@clalegal.com
Email: mark@clalegal.com
Email: adam@clalegal.com
Email: john@clalegal.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170 KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Counsel for Plaintiffs*